UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| REDKO INNOVATIONS, INC., | Case No. 24-CV-2452 (PJS/SGE) |
| Plaintiff, | |
| v. | ORDER |
| WALMART, INC., | |
| Defendant. | |

Michael A. Collyard and Peter Ihrig, ROBINS KAPLAN LLP, for plaintiff.

Sanjiv P. Laud and J. Thomas Vitt, MCCURDY LAUD, LLC, for defendant.

Plaintiff RedKo Innovations, Inc. ("RedKo") is a Minnesota corporation founded about 20 years ago by two friends to commercialize an idea. RedKo's idea was that retailers should make it easy for consumers who own a movie on a format that is becoming obsolete (such as videotape) to upgrade to a newer format (such as DVD) without paying the full retail price of the new format. RedKo pitched its idea to defendant Walmart, Inc. ("Walmart") on three separate occasions between 2005 and 2011, but RedKo and Walmart never reached a formal agreement.

In March 2012, RedKo learned that Walmart had launched a Disc-to-Digital service, which allowed a customer who owned a copy of a movie on DVD or Blu-ray to pay a small fee to receive the right to watch that movie on Walmart's streaming service (called "Vudu"). Compl., ECF No. 1 ¶¶ 78–80. Twelve years later, RedKo brought this

action, alleging that Walmart had breached an implied-in-fact contract or, in the alternative, that Walmart had been unjustly enriched.

Walmart now moves to dismiss RedKo's complaint. For the reasons that follow, the Court grants Walmart's motion.

I.  BACKGROUND

Bryon Rediger and Nick Koppy are friends who formed RedKo to commercialize an idea.  *Id.* ¶¶ 33–35.  Their idea was that retailers should offer consumers the opportunity to upgrade movies they owned on older formats (such as VHS) to newer formats (such as DVD) without having to pay the full retail price of the newer formats. *Id.* ¶¶ 35–36.  Early versions of RedKo's idea contemplated converting VHS tapes to DVDs; later versions contemplated a range of other conversions, such as DVD-to-Blu-ray or Blu-ray-to-digital.  *Id.* ¶ 52.

RedKo first pitched its idea to Walmart in 2005, and RedKo pitched it again in 2010.  *Id.* ¶¶ 45, 48.  Both times, Walmart declined to do business with RedKo.  *Id.* ¶¶ 46, 54.  In June 2011, RedKo again reached out to Walmart, once again hoping to interest Walmart in its idea.  *Id.* ¶ 55.  After getting an appointment to speak to a Walmart executive, RedKo sent a slide deck ("the Presentation") to the executive.  *Id.* ¶ 59.  The Presentation contained what RedKo characterized as confidential and proprietary information about its idea.  *Id.* ¶¶ 59–62.

In its complaint, RedKo alleges that the Presentation also made a contract offer to Walmart—an offer that, in RedKo's words, "set forth the financial terms of the [proposed] agreement." *Id.* ¶ 63. But the only thing in the Presentation that even remotely resembled a "financial term" appeared in the last bullet point on a slide captioned "Benefits for the Retailer."[1] Ex. A, ECF No. 29 at 6.[2] That slide, in its entirety, read as follows:

**Benefits for the Retailer**

- **Option of exclusivity.** The first retailer to offer ReKo's [sic] program, will have the option of an exclusive license, guaranteeing 100% of the volume and locking out its competitors

- **Grow market share.** Pull customers away from competitors

- **Retain existing customer base; grow customer loyalty by offering a new service**

- **Increase online visitors and in store foot traffic**

---

[1] Walmart filed a copy of the Presentation with its reply brief. ECF No. 27; Ex. A, ECF No. 29. As neither party has challenged the authenticity of Walmart's filing, and as the Presentation is necessarily embraced by the complaint, the Court will consider the Presentation without converting Walmart's motion to dismiss into a motion for summary judgment. *See Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) ("Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." (internal quotation marks omitted)).

[2] When citing documents by ECF number, the Court cites to the electronically generated page numbers at the top of the page.

- **Significant uplift for the retailer's Entertainment Division.** Guarantees that every DVD that comes in means a new Blu-ray going out (not so with current trade-in programs)

- **New way to sell an existing product**

- **Sell additional (possibly higher margin) items while customers upgrade their movies**

- **Opportunity to cross-promote specific items or steer traffic to other departments**

- **Low cost license.** (Cents per unit exchanged) for a retailer to offer RedKo's program.

*Id.* According to RedKo, in this final bullet point, "RedKo offered the Movie Program to Walmart in exchange for being paid cents per movie unit upgraded." Compl. ¶ 63.

The parties then spoke three times by phone. *Id.* ¶¶ 64–73. During a June 2011 call, the parties discussed strategies for obtaining cooperation from the movie studios. *Id.* ¶ 65. During an August 2011 call, a Walmart executive asked if RedKo was willing to sell exclusive rights to its idea to Walmart, and RedKo confirmed that it was. *Id.* ¶ 67. The parties also discussed how the proposed upgrade program could be used to promote digital movie formats and how Walmart could implement the program. *Id.* ¶¶ 68–69. At the conclusion of that call, a Walmart executive represented to RedKo that "he wanted to get moving on this and get the program implemented." *Id.* ¶ 70. Finally, during a September 2011 call—involving a different Walmart executive—the parties again discussed how Walmart could implement RedKo's idea. *Id.* ¶ 73.

After the September 2011 call, however, Walmart ghosted RedKo. Walmart canceled two meetings with RedKo and then altogether stopped responding to RedKo's communications. *Id.* ¶¶ 74–76. The complaint does not allege that Walmart communicated in any way with RedKo after October 2011.

In March 2012, RedKo learned that Walmart had launched a Disc-to-Digital service, which enabled a customer who owned a movie on DVD or Blu-ray to pay a fee to Walmart. *Id.* ¶¶ 78–80. After paying the fee, the customer could keep the DVD or Blu-ray, but the customer would also be given access to the movie through his or her Vudu account. *Id.* ¶¶ 79–80. Vudu was a video-on-demand service that was owned by Walmart and that allowed customers to buy or rent streaming versions of movies. *See id.* ¶ 100 & 100 n.7.[3] Walmart sold the service to Fandango Media in 2020, and the service is now known as Fandango at Home. *Id.*

RedKo filed this action on June 24, 2024. Count I alleges that the parties have an implied-in-fact contract, under which Walmart owes RedKo "cents" (the complaint does not say how many "cents") for every movie that was upgraded under Walmart's Disc-to-Digital service. *Id.* ¶¶ 93, 104. Count II alleges that Walmart has been unjustly enriched by using information that it received from RedKo to launch its Disc-to-Digital service. *Id.* ¶¶ 110–13. The Court will address these claims in turn.

---

[3]Citing https://www.vudu.com/content/movies/d2d?start_mode=SCAN.

II. ANALYSIS

*A. Standard of Review*

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019). A court is not, however, required to accept as true the legal conclusions that the complaint draws from the facts alleged. *See Glick v. Western Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must dismiss any claim that is not "plausible on its face." *Id.* at 570.

*B. Breach of an Implied-in-Fact Contract*

1. Statute of Limitations

To begin with, Walmart argues that RedKo's breach-of-contract claim is barred by the statute of limitations. A claim may be dismissed on a Rule 12(b)(6) motion if it is clear from the face of the complaint that the claim is untimely. *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011). "To determine whether a complaint is self-defeating based on the statute of limitations, a court must identify the relevant limitations period,

the date the action was commenced, and the date the plaintiff's claims accrued." *Untiedt's Vegetable Farm, Inc., v. S. Impact, LLC*, 493 F. Supp. 3d 764, 767 (D. Minn. 2020).

Under Minnesota law, a claim for breach of contract (whether express or implied) is subject to a six-year statute of limitations. Minn. Stat. § 541.05, subd. 1(1). Such a claim "accrues at the time of the breach," even if actual damages do not occur until much later. *TCF Nat. Bank v. Market Intel., Inc.*, 812 F.3d 701, 710 (8th Cir. 2016) (cleaned up). This action was commenced for purposes of Minnesota law[4] on June 25, 2024, when Walmart was served with the summons and complaint. ECF No. 4. Hence, RedKo's claim for breach of an implied-in-fact contract is time-barred if it accrued prior to June 25, 2018.

Walmart argues that if an implied-in-fact contract existed (which Walmart denies), that contract was breached—and the six-year limitations period began to run—when Walmart launched its Disc-to-Digital program in 2012. Def. Mem., ECF No. 16 at 10–11; ECF No. 28 at 2–3. If Walmart is correct, RedKo filed its breach-of-contract claim six years too late. By contrast, RedKo argues that, under the doctrine of continuous accrual, Walmart breached the parties' contract every time it upgraded a

---

[4]In a diversity action, "state commencement rules apply because they are part and parcel of the statute of limitations." *Larsen v. Mayo Med. Ctr.*, 218 F.3d 863, 867 (8th Cir. 2000) (internal quotation marks omitted). Rule 3.01(a) of the Minnesota Rules of Civil Procedure provides that a civil action is commenced against a defendant "when the summons is served upon that defendant."

movie as part of its Disc-to-Digital service and failed to pay RedKo. Pl. Mem., ECF No. 22 at 17–20; *see also* Compl. ¶ 108. As RedKo would have it, then, Walmart breached the parties' contract *thousands* of times. RedKo concedes that the statute of limitations bars its claim for the thousands of breaches that occurred prior to June 25, 2018, but argues that its claim for the thousands of breaches that occurred on or after June 25, 2018 is timely.

RedKo has the better of the argument. In *Park Nicollet Clinic v. Hamann*, the Minnesota Supreme Court expressly distinguished its prior decision in *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801 (Minn. 1989), in the following way:

> This case is . . . distinguishable from *Levin* and the other cases cited by Hamann in which an employer has a continuing contractual or statutory obligation to pay wages or other benefits that gives rise to a new cause of action each time there is an improper payment. . . . In contrast to th[o]se cases, the complaint here alleges a single breach of an obligation that Park Nicollet owed in April 2005, when Hamann sought performance.

808 N.W.2d 828, 835–36 (Minn. 2011).

In this case, RedKo alleges that Walmart had "a continuing contractual . . . obligation to pay" compensation to RedKo every time Walmart converted a movie. *Id.* at 835. In other words, RedKo is making a *Levin* claim, not a *Hamann* claim. RedKo's claim may be meritless, but the claim, as pleaded, is not barred by the statute of

limitations insofar as that claim seeks to recover compensation for conversions that occurred on or after June 25, 2018.

2. Sufficiency of the Pleadings

That is not the end of the matter, however. The fact that RedKo's breach-of-contract claim is timely does not mean that it is viable. To plead a viable claim that Walmart was bound by a contract, RedKo must plausibly allege "offer, acceptance, and consideration . . . ." *Carufel v. Minnesota Dep't of Public Safety*, A18-0476, 2018 WL 6596287, at *8 (Minn. Ct. App. Dec. 17, 2018) (citing *Com. Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006)). "Formation of a contract is judged by the objective conduct of the parties." *Thomas B. Olson & Assoc., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008).

RedKo's complaint does not plausibly plead *any* of these elements.

As noted, formation of an implied-in-fact contract requires an offer, but the Court has difficulty discerning—and RedKo's counsel had difficulty explaining[5]—what exactly RedKo *offered* to Walmart. RedKo's complaint refers to its "movie program" but does not describe what its "movie program" actually entailed. Was it a business

---

[5]When the Court asked "what [RedKo was] doing in return for [a few cents per conversion]," RedKo's counsel responded that "[i]t's what [RedKo] *did*." Hr'g Tr., ECF No. 33 at 18 (emphasis added). The Court asked: "So Walmart is agreeing to pay [RedKo] for something they've already done?" *Id.* RedKo's counsel responded: "Well, agreeing to pay them for bringing this program." *Id.* Counsel could not otherwise explain what RedKo was offering to do in return for payment from Walmart. *Id.* at 18–19.

-9-

concept? Hardware? Software? Some combination? Was it protected by a patent? A trademark? A copyright? Some combination? The complaint is unclear—and, even after oral argument, the Court still is not certain what, exactly, RedKo offered to *do* for Walmart in return for millions of dollars.

The Presentation does refer to a "patented" program, which seems to suggest that RedKo was offering to sell a license to use patented technology or patented business methods. Ex. A at 5. But the patent is not identified in either the complaint or the Presentation, and thus it is impossible to discern from the complaint whether the patent existed in 2012, what the patent covered, or how closely Walmart's Disc-to-Digital service resembled whatever the patent protected. (Notably, RedKo never brought or threatened to bring a patent-infringement action.) At oral argument, RedKo's counsel was unable to address any of these issues. Hr'g Tr. at 15–18.[6]

The problems continue. Nowhere does the Presentation—which, again, RedKo characterizes as its offer to enter into a contract—discuss the financial terms of the proposed contract. RedKo points to the four-word phrase "[c]ents per unit exchanged"

---

[6]For example, the Court asked: "You say 'program.' Is this [program] trademark protected? Copyright protected? Patent protected? Or just kind of a trade secret in their heads?" Hr'g Tr. at 15–16. RedKo's counsel responded: "[W]ell, with my theory in this case with what we've pled, it's a program." *Id.* at 16. The Court tried again, asking what "information [RedKo] is sharing with Walmart" and whether RedKo "ha[s] a property interest in it." *Id.* at 16. RedKo's counsel offered that RedKo "ha[s] a patent on" the program but was not sure when the patent issued or whether RedKo had a patent in 2011. *Id.* at 17. Counsel later affirmed that he "believe[d]" RedKo had "a patent" in 2011, *id.* at 21, but could not definitively say so.

-10-

that appears in the Presentation. But that phrase appears only one time, in the middle of the Presentation, after the words "[l]ow cost license" (a license that is never described), and as the last item in a bullet-point list of "[b]enefits" a retailer offering RedKo's program might enjoy, such as "[p]ull[ing] customers away from competitors," "[i]ncrease[d] foot traffic," and a "[n]ew way to sell an existing product." Ex. A at 6. In context, the reference to a "[l]ow cost license" appears, not as an *offer*, but rather as one of many "Benefits for the Retailer" (to quote the title of the slide on which the reference appears).

Moreover, "[c]ents per unit exchanged"—the "financial terms" that supposedly make up the heart of the contract between RedKo and Walmart—appears *in parentheses*. No further discussion of "cents per unit exchanged" appears in the Presentation, and RedKo does not allege that either party so much as mentioned the "financial terms" of this alleged offer in any of their other communications. The notion that Walmart would agree to a contract that could bind it to pay millions of dollars to RedKo without even *discussing* the financial terms is simply not plausible.

Even if the complaint plausibly alleged that RedKo made a contractual offer under which Walmart would be required to pay "[c]ents per unit exchanged" in return for whatever product, service, or idea RedKo was offering, "cents" is not a reasonably definite price term. RedKo argues that "a few cents"—a phrase nowhere used in the Presentation or in any other communication with Walmart—is a sufficiently clear price

-11-

term. Pl. Mem. at 11–12; *see* Hr'g Tr. at 22–24. But even if the Presentation had referred to "a few cents" rather than to "[c]ents," the Court's brief Internet search of the term "a few cents" confirms that the term encompasses a wide range of "cents." *See* Hr'g Tr. at 22. For purposes of this litigation, a value at the high end of the range could cost Walmart tens of millions of dollars more than a value at the low end. *Id*. In short, RedKo has not alleged that it offered a price *term*, but instead that it offered to negotiate a price term within a *range*.

RedKo argues that the problems identified by the Court are ambiguities that a jury can resolve. Pl. Mem. at 10, 12–13. RedKo misses the point. RedKo's problem is not one of contract interpretation, but contract formation. What the Court has identified are not ambiguities in a contract. Instead, what the Court has described are reasons—many reasons—why RedKo has not plausibly alleged that an offer was even *made*. A jury cannot resolve an ambiguity in a contract that does not exist.

Even if the complaint did plausibly allege that RedKo had made a contract offer—and that the terms of that offer were sufficiently definite—the complaint does not plausibly allege that Walmart *accepted* the offer. It is not plausible to suggest that Walmart implicitly accepted the offer when it launched its Disc-to-Digital Service. As Walmart points out, the program described in the Presentation is not the same as the program that Walmart launched. The Presentation described a program under which old hard media would be exchanged for new hard media. *See* Ex. A at 3, 4, 6 ("every

DVD that comes in means a new Blue-ray going out"). By contrast, Walmart's Disc-to-Digital service allowed a customer who owned a movie on hard media to keep that hard media and pay a discounted fee to have access to a streaming version of that movie. Given the substantial difference between the program offered by RedKo and the program implemented by Walmart, the implementation of the latter does not appear to be some kind of acceptance of RedKo's offer of the former.

RedKo also implies that Walmart accepted RedKo's offer by what it said during the three phone conversations in 2011. *See* Pl. Mem. at 9. Again, the alleged facts belie this argument. The complaint describes the content of the conversations: the parties discussed strategy and Walmart's meetings with movie executives; discussed the possibility of exclusive rights to RedKo's program (without any follow up or follow through); and discussed the possible logistics of implementing RedKo's program. Compl. ¶¶ 64–73. Nowhere does the complaint allege that the parties so much as mentioned a price, a payment structure, or an implementation time line. Nor does the complaint describe any commitment of any kind that either party made to the other. Against this backdrop, the fact that one executive, one time, said "he wanted to get moving on this and get the program implemented" cannot plausibly be construed as acceptance of an offer to enter into a binding agreement. Saying "I'd like to get a deal done" is not the same as saying "we have a deal"; indeed, it is evidence that we *don't* have a deal.

One final point:  It appears from the complaint that, after Walmart stopped responding to RedKo in October 2011, the parties did not communicate at all, even after Walmart launched the Disc-to-Digital program in March 2012.  Despite knowing of the Disc-to-Digital program when it was launched, RedKo did not make a peep until *12 years later*, when it filed this lawsuit.  Needless to say, this is not the behavior of parties to a binding agreement, especially a binding agreement requiring one party to pay millions of dollars to the other party.

For all of these reasons, the complaint falls far short of plausibly alleging "circumstances that clearly and unequivocally indicate the intention of the parties to enter into a contract."  *Webb Bus. Promotions, Inc. v Am. Elec. & Ent. Corp.*, 617 N.W.2d 67, 75 (Minn. 2000).  The Court therefore dismisses RedKo's claim for breach of an implied-in-fact contract.

### B.  Unjust Enrichment

To plead a plausible unjust-enrichment claim under Minnesota law, a plaintiff must plausibly allege "(1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it."  *Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007).  The applicable statute of limitations is six years.  Minn. Stat. § 541.05, subd. 1(1).  The statute of limitations begins to run when the cause of action accrues.

*Hamann*, 808 N.W.2d at 832. "A cause of action accrues when all of the elements of the action have occurred, such that the cause of action could be brought and would survive a motion to dismiss for failure to state a claim." *Hamann*, 808 N.W.2d at 832; *see also Block v. Litchy*, 428 N.W.2d 850, 854 (Minn. Ct. App. 1988). Under Minnesota law, "[a] cause of action for unjust enrichment accrues when damage occurs." *Graff v. Brighthouse Life Ins. Co.*, 698 F. Supp. 3d 1080, 1087 (D. Minn. 2023), *aff'd*, 109 F.4th 1118 (8th Cir. 2024). Minnesota courts "have generally defined the occurrence of 'some damage' as the occurrence of *any compensable damage* . . . ." *Hansen v. U.S. Bank Nat'l Assoc.*, 934 N.W.2d 319, 327–28 (Minn. 2019) (emphasis in original) (cleaned up).

The complaint alleges that RedKo conferred a benefit on Walmart "by providing it with . . . confidential information and plans, strategies and know how about RedKo's novel business concept, the Movie Program." Compl. ¶ 110. That occurred, at the latest, in September 2011 (during the parties' final discussion). RedKo alleges that Walmart understood, accepted, and retained this benefit and used it to launch the Disc-to-Digital service. That occurred, at the latest, in March 2012. And thus the "circumstances that [made] it . . . inequitable for [Walmart] to retain [the benefit] without paying for it" arose (at the latest) in March 2012, when Walmart launched the Disc-to-Digital service and thereby commercialized the benefit that RedKo had conferred on it. *Dahl*, 742 N.W.2d at 195. At that point, "all of the elements of the action ha[d] occurred, such that the cause of action could be brought and would survive a

motion to dismiss for failure to state a claim." *Hamann*, 808 N.W.2d at 832.  In short, the six-year statute of limitations began to run in March 2012 and expired long before this action was commenced in June 2024.

RedKo argues that, even though the complaint does not allege that RedKo conferred any benefit on Walmart after September 2011, a new cause of action for unjust enrichment arose each time Walmart was paid to convert a movie under its Disc-to-Digital service.  At oral argument, RedKo's counsel explained that, "There's no damage until there's an exchange. . . . Those damages are different each and every time."  Hr'g Tr. at 27.  In essence, then, RedKo is asking the Court to apply to its unjust-enrichment claim the same doctrine of continuous accrual that saved its breach-of-contract claim from being barred by the statute of limitations.

RedKo has not cited—and the Court has not found—any case holding that, under Minnesota law, the doctrine of continuous accrual applies to unjust-enrichment claims.  That is not surprising, as the type of breach-of-contract claim to which the doctrine applies (a *Levin* claim) is fundamentally different from an unjust-enrichment claim.

In the *Levin* situation, the defendant has "a continuing contractual or statutory obligation" to pay money to the plaintiff.  *Hamann*, 808 N.W.2d at 835.  For example, an employer has an obligation to pay wages to an employee every week, or a tenant has an obligation to pay rent to a landlord every month, or a manufacturer has an obligation to

pay royalties to an inventor every quarter. Obviously, no cause of action accrues for, say, a tenant's failure to pay rent on September 1, 2030, until the tenant actually fails to pay rent on September 1, 2030. Not until the tenant misses the rent payment due on September 1, 2030 can the landlord sue for that payment. Understandably, then, each missed rent payment "gives rise to a new cause of action." *Id.*

In the unjust-enrichment situation, by contrast, the legal wrong is not breaching a promise to perform on a particular date, but wrongfully retaining a benefit that has already been conferred. Here, the benefit conferred in September 2011 was, in RedKo's words, "confidential information and plans, strategies and know how about RedKo's novel business concept." Compl. ¶ 110. Walmart's "retention" of that benefit became wrongful—and caused damage—when Walmart launched its Disc-to-Digital service in March 2012 and thereby used the "novel business concept" without paying for it. At that point, RedKo could have sued Walmart for unjust enrichment and, if it prevailed, the court would have "restored [the parties] to the Status quo as far as practicable." *Tompkins v. Sandeen*, 67 N.W.2d 405, 409–10 (Minn. 1954). The court would have done so by awarding to RedKo—and taking from Walmart—money damages representing the value of "the benefit that the defendant received[,] [which] is the measure of relief for an unjust enrichment claim." *Herlache v. Rucks*, 990 N.W.2d 443, 450 (Minn. 2023). In assessing the value of the benefit that Walmart wrongfully "received" in September 2011—i.e., in determining the value *in September 2011* of the "confidential information

and plans, strategies and know how about RedKo's novel business concept"—the court could, of course, consider the amount of profit that a retailer could reasonably expect to earn in the future by implementing RedKo's "novel business concept."

Nothing happened after March 2012 to give rise to a *new* cause of action for unjust enrichment, quite simply because *RedKo* did not confer a benefit on Walmart after March 2012. The profits that Walmart earned from wrongfully implementing RedKo's "novel business concept" may (or may not[7]) have been evidence of the value of the concept in September 2011, but the many thousands of payments by customers to

---

[7]An analogy used by Judge J.P. Stadtmueller in discussing the measure of damages for unjust enrichment illustrates why Walmart's profits may not even be relevant to the value of the Movie Program at the time it was conferred on Walmart:

> Last summer, a story hit the national news where a seventeen year old boy, through a series of fourteen "swaps" using the Craigslist website, traded an old cell phone for a 2000 Porsche Boxster S. . . . Had the teenager acquired the cell phone such that it was "inequitable" to retain the phone without payment of the value in the first place, it would be patently absurd for the original owner of the cell phone to sue the teen under a theory of unjust enrichment demanding the value of the Porsche. The value of the benefit the teen received in that case is not a product of what the old cell phone *actually yielded*—it is a product of the value of the benefit the defendant received *when he acquired the cell phone*. Likewise, FS provides no reason to conclude that the value of the information the plaintiff provided the defendant is a product of what that information actually yielded or potentially could yield.

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 898–99 (E.D. Wis. 2010) (emphasis added).

convert their movies did not give rise to many thousands of new and distinct causes of action for unjust enrichment.

A simple analogy illustrates the point. Suppose that Aaron learns that the child of his coworker Beatrice has been diagnosed with a serious illness. Aaron buys a new bicycle for the child for $150, attaches a ribbon and a get-well card to the bicycle, and leaves the bicycle outside of what he mistakenly believes is the door to Beatrice's apartment. An hour later, the actual occupant of the apartment, Carl, comes home, sees the bicycle, realizes Aaron's mistake, and decides to keep the bicycle for himself. The next day, Aaron asks Carl to return the bicycle, but Carl refuses.

At this point, Adam can bring an unjust-enrichment claim against Carl and recover the value of the bicycle—$150. He has one cause of action, it has accrued, and the statute of limitations has begun to run. A new cause of action does not arise every time Carl rides the bike, or every time Carl rents the bicycle to a tourist, or when Carl later sells the bicycle for $75. Similarly, in this case, a new cause of action for *unjust enrichment* (as opposed to *breach of contract*) did not arise every time Walmart benefitted in some way from its wrongful retention of the "novel business concept."

The case on which RedKo relies in arguing to the contrary is readily distinguishable. In *Block v. Litchy*, a buyer of land sought to recover payments she had made to the seller in excess of what she owed to the seller under a contract for deed. 428 N.W.2d at 853. The buyer "made"—that is to say, "conferred"—multiple

overpayments to the seller within six years of filing her complaint, which payments the seller knowingly received and wrongfully retained. The Minnesota Court of Appeals concluded that a new claim for unjust enrichment arose each time the buyer made and the seller retained a new overpayment, as each time that occurred the elements of an unjust-enrichment claim were established anew as to the new overpayment. In other words, the *plaintiff* (not a third party) continued to confer *new* benefits on the defendant. Here, by contrast, RedKo alleges that *it* last conferred a benefit on Walmart in 2011. *See* Compl. ¶ 110. RedKo, unlike the plaintiff in *Block*, did not continue to confer new benefits on Walmart.

For these reasons, the Court dismisses RedKo's unjust-enrichment claim as time-barred.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendant's motion to dismiss [ECF No. 11] is GRANTED and plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 19, 2025
                                                s/Patrick J. Schiltz
                                                Patrick J. Schiltz, Chief Judge
                                                United States District Court